UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 21-cr-219 (ECT/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Deandre Lashawn Robinson, | |
| Defendant. | |

## INTRODUCTION

Defendant Deandre Lashawn Robinson moves to suppress evidence obtained from the search of his Mercedes SUV, as well as the search and seizure of a Toyota rental car, rented in someone else's name. He also challenges the validity of a Cell-Site Location Information (CSLI) warrant, which helped officers locate him in April 2022. Furthermore, he challenges un-Mirandized statements made to officers in April 2022. For the reasons set forth below, the Court recommends his motions [Dkt. Nos. 30, 31, 66, 67, 68, 80] be denied.

## FINDINGS OF FACT

**I.   August 2021: Mercedes Search and Defendant Questioning**

On August 3, 2021, Minneapolis Police Department (MPD) placed a GPS tracker on Robinson's Mercedes SUV pursuant to a warrant. Tr. of Mot. Hrg. at 44:8-23; 47; 1-5; Dkt. No. 87.[1] Approximately three days earlier, a Confidential Reliable Informant (CRI) informed MPD they believed Robinson was in possession of a firearm and was selling

---

[1] Robinson does not challenge the validity of this warrant.

1

narcotics including Fentanyl out of his car. *Id.* at 45:1-9. According to the CRI, Robinson kept both drugs and firearms in his car. *Id.* at 52:8-22. The CRI provided MPD with details about Robinson, including his legal name, where he lived, the type of car he drove (the Mercedes), and the temporary license plate number on that car. *Id.* at 47:7-25. The CRI also told MPD that they and Robinson had an ongoing social relationship. *Id.* at 50:5-13. MPD corroborated that information, tracking Robinson's Mercedes around the Twin Cities and witnessing hand-to-hand transactions, believed to be the sale of narcotics. *Id.* at 48:6-19.

On August 11, 2021, MPD followed Robinson's Mercedes from Forest Lake to Brookyln Park. *Id.* at 51:17-2. Robinson parked the car on a residential street and MPD approached the car and arrested Robinson pursuant to a warrant issued in Wisconsin. *Id.* at 52; Gov. Ex. 2. Robinson was removed from the car, handcuffed, and placed in the back of a police squad car. Gov. Ex. 1[2] at 11:08:50-11:10-25. The passenger in his car was also detained. Tr. of Mot. Hrg. at 76-77. Officer Kristopher Dauble noticed white powder under Robinson's nose and smelled marijuana. Tr. of Mot. Hrg. at 54:1-5. When removing Robinson from the car, Dauble exclaimed "Hey, what's on your nose?" Gov. Ex. 1 at 11:09:05. After Robinson and the passenger were removed from the Mercedes, officers began searching the vehicle. Gov. Ex. 1 at 11:10:48. Officers found a firearm hidden behind a plastic panel in the backseat of the car. Gov. Ex. 1 at 11:12:52; Tr. of Mot. Hrg. at 103:1-7. The panel itself was behind the folding armrest located in the backrest of the rear passenger seat—essentially hidden inside the backrest of the

---

[2] Government Exhibit 1 was never admitted at the hearing on this matter, but because both the Government and the Defendant have relied on it in their briefing, the Court will admit it.

backseat. Tr. of Mot. Hrg. at 103:1-7. Law enforcement also located drugs hidden behind a panel in the trunk of the Mercedes. *Id.* at 103:15-18. Robinson claims this search was unlawful for lacking a warrant and failing to meet any of the delineated exceptions to the Fourth Amendment's warrant requirement. Def. Mem. in Support of Suppression Mots. (Def. Mem.) at 13-17; Dkt. No. 94. In connection with that argument, he argues the CRI's information was stale by the time of the search. *Id.* at 16.

As officers were getting ready to leave the scene and transport Robinson to jail, he exclaimed that he had just swallowed a handful of drugs and needed to go to the hospital. Gov Ex. 1 at 11:42:44. Officers removed Robinson from the squad car and, believing the pills may have been Fentanyl, administered Narcan an opioid antagonist that "rapidly reverses an opioid overdose." Naloxone DrugFacts, National Inst. on Drug Abuse (January 2022);[3] Gov. Ex. at 11:46:19. Paramedics arrived and began caring for Robinson, eventually transporting him to the hospital. *Id.* at 11:51:03-12:00:24. While en route to the hospital, Robinson stated his eyesight was blurry. *Id.* at 12:02:32. Later, he was able to identify and monitor colors on a screen while conferring with one of the paramedics. *Id.* at 12:08:55-12:09:38. He seemed aware of what the paramedics were doing, objecting to their inserting an IV in his arm. *Id.* at 12:08:08. He confirmed he was born in 1992, though he also had trouble remembering his whole date of birth. *Id.* at 12:07:50; 12:12:25, 12:13:40. He appeared to laugh intermittently. *E.g. id.* at 12:17:20. He also seemed disoriented, asking where he was. *Id.* at 12:24:40.

---

[3] https://nida.nih.gov/download/23417/naloxone-drugfacts.pdf?v=8b748408194dff241c227cf6c7c9d04e

Later that day, Officer Dauble spoke with Robinson at the hospital. Tr. of Mot. Hrg. at 59:11-16; Gov. Exs. 3, 4. The timing of this conversation is somewhat unclear. Dauble reported that he encountered Robinson at HCMC about 30-45 minutes after concluding at the scene of Robinson's arrest. Tr. of Mot. Hrg. at 59:6-12; Dkt. No. 87. He also stated it was about an hour after Robinson was arrested. *Id.* at 59:12-18. Robinson was arrested at 11:09 in the morning. Gov. Ex. 1 at 11:08:58-11:10:00. He was then transported from the scene to HCMC from 12:00pm until approximately 12:30pm. *Id.* at 12:00:00-12:30:25. Because Robinson was in an ambulance an hour after his arrest, the Court assumes Dauble meant he encountered Robinson an hour after either he, Dauble, left the scene or after Robinson left via ambulance. Because the Court does not know exactly when Dauble left the scene, the timing remains muddled.

At HCMC Officer Dauble read Robinson his *Miranda* rights. Gov. Ex. 3 at 4:03-4:30. Upon hearing that any statements he made would be used against him, Robinson exclaimed "Oh, you going to use it against me for sure." *Id.* at 4:09-4:11. When asked if he knew "all those rights" and wanted to talk with Officer Dauble, he replied "Yeah, yeah we can talk about it, yeah." *Id.* 4:30. Officer Dauble then proceeded to question Robinson, asking him about the drugs and firearm found in the Mercedes. *Id.* at 4:40-5:20. Robinson argues all statements made during this conversation should be suppressed because his *Miranda* waiver was not knowing and intelligent as required under the law. At bottom, he argues that because he had taken Fentanyl only an hour or so earlier, he was under the influence of drugs and his waiver was invalid. Def. Mem. at 17-19; Dkt. No. 94.

4

## II. April 2022: Toyota Seizure & Search and Defendant Questioning

Months later, MPD applied for and received a warrant for Cell-Site Location Information (CSLI) connected to Robinson's cell phone hoping to locate him to execute various warrants for his arrest. Gov. Ex. 7. CSLI or "ping" information allows law enforcement to track an individual—each time their cell phone connects to a cell tower a record of the connection is recorded. Location information from these pings is precise enough to place a person within a single city block. Tr. of Mot. Hrg. at 26: 13-18; Dkt. No. 88. Using that CSLI, MPD learned Robinson was likely inside Hennepin County Medical Center (HCMC). *Id.* at 26:19-21. MPD officers learned from Hennepin County deputies that Robinson was in the emergency department and located him there. *Id.* at 27:1-9.

After finding Robinson, MPD arrested him. *Id.* at 28:13; Gov. Ex. 5 at 12:54:28. During a search incident to arrest, police found a key to a Toyota, which Robinson stated belonged to his friend Tony. Gov. Ex. 5 at 12:55:30. He also asked the police to call Tony several times. *E.g. id.* at 12:57:13; 12:57:45. Robinson told police that Tony had driven him to the hospital. *Id.* at 12:57:50. Officers then located the Toyota, which was legally parked, and towed it to the City of Minneapolis impound lot. Tr. of Mot. Hrg. at 30-33; Dkt. No. 88.

While officers were locating and towing the Toyota, Officer Dauble and others stayed with Robinson in the hospital and spoke about various topics, including Robinson's drug use. Gov. Exs, 5, 6. Later that afternoon, Tony arrived at Robinson's hospital bay and asked for the Toyota keys. Gov. Ex. 6. at 14:41:39-14:42:40. Robinson and Tony discussed the car and questioned how law enforcement could seize Tony's car. *Id.* at 14:44-14:47. Robinson repeated the car did not belong to him. *Id.* 14:44:20. He also

5

stated he had never driven the car. Gov. Ex. 6 at 14:46:41. Tony later told defense counsel he had given Robinson the keys to the rental car so Robinson could smoke cigarettes in the car. Def. Ex. 6. About an hour later, Robinson ingested pills believed to be Fentanyl that he had secreted on his person. Gov. Ex. 6 at 15:29:28. Hospital staff monitored him for potential overdose. *Id.* at 15:31:30.

A few days after Robinson's arrest at HCMC, Officer Dauble went to the impound lot to view the Toyota. Tr. of Mot. Hrg. at 64:14-65:10. Looking into the car through the windows, Dauble observed marijuana seeds and stems, as well as aluminum foil which he suspected was used to smoke drugs. *Id.* at 64:17-23. A narcotics-trained canine sniffed around the perimeter of the car the following day and alerted Dauble to drugs in the car. *Id.* at 65:9-17; Gov Ex. 8 at 8. The Bureau of Alcohol, Tobacco, Firearms, and Explosives applied for and obtained a warrant to search the Toyota. *Id.* at 39:23-40:7; Gov. Ex. 8. Robinson challenges the search and seizure of the Toyota, arguing the police lacked probable cause to seize and impound the Toyota, and that the subsequent search of the car was thus tainted as fruit of the poisonous tree. Def. Mem. at 24-35; Dkt. No.94. The Government argues, among other things, that Robinson had no legitimate expectation of privacy in the Toyota and has no standing to challenge its seizure or search. Gov. Response to Def. Pretrial Mots. to Suppress Evidence (Gov. Mem.) at 21-24; Dkt. No. 98.

## CONCLUSIONS OF LAW

### I.     Mercedes Search

The Fourth Amendment prohibits "unreasonable searches and seizures," and provides that law enforcement may only obtain a warrant "upon probable cause,

6

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. "Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances." *United States v. Notman*, 831 F.3d 1084, 1088 (8th Cir. 2016). To be valid, a warrant must set forth "sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place" *Id.* The totality-of-the-circumstances test for reviewing a probable cause determination means that such inquiries are "not readily, or even usefully, reduced to a neat set of legal rules." *Florida v. Harris*, 568 U.S. 237, 243 (2013). While judges issuing search warrants may "draw reasonable inferences from the totality of the circumstances" *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (quoting *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009)), a warrant issued based only on a supporting affidavit that merely asserts conclusions rather than facts may be invalid. *Aguilar v. Texas*, 378 U.S. 108, 113 (1964) (internal citations omitted).

Reviewing courts must afford "great deference" to the probable cause determination of the judge who issued the warrant and should resolve even "doubtful or marginal cases" in favor of a warrant's validity. *United States v. Butler*, 594 F.3d 955, 962 (8th Cir. 2010) (citation omitted); *see United States v. Ventresca*, 380 U.S. 102, 109 (1965). So long as the issuing judge had a "substantial basis" for concluding the "search would uncover evidence of wrongdoing," this Court must uphold the probable cause determination. *United States v. Horn*, 187 F.3d 781, 785 (8th Cir. 1999).

Warrantless searches are per se unreasonable unless an established exception to the warrant requirement applies. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). Among those exceptions is the automobile exception which provides that police may search a vehicle so long as they have probable cause to believe the vehicle contains evidence of a crime or contraband. *Id.* Where "there is a fair probability" that contraband will be found in a place, there is probable cause to search. *Id.* (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). The automobile exception is animated by the inherently mobile nature of vehicles and the concomitant possibility that evidence contained in them may be easily moved and secreted, as well as a lesser expectation of privacy one has in their automobile compared to their home. *Calif. v. Carney*, 471 U.S. 386, 392 (1985). This lesser expectation of privacy manifests from "the pervasive regulation of vehicles capable of traveling on public highways." *Id.* Even where there is little to no chance the automobile will be moved, the automobile exception may still apply. *Cady v. Dombrowski*, 413 U.S. 433, 441-442 (1973).

The Government does not dispute that police lacked a warrant to search the Mercedes on August 11, 2021. Instead, the Government argues that the automobile exception justified the search, contending there was probable cause to believe evidence of a crime would be found in the car. Probable cause, the Government argues, was based on the corroborated information from the CRI and Dauble's observations indicating drug use at the scene. Gov. Mem. at 13; Dkt. No. 98. Robinson argues the automobile exception is inapposite here because by the time of the search the CRI's information was stale, being at least eleven days old. Furthermore, Robinson argues that on the day of

8

the search police had not seen any suspected drug deals or observed a firearm in the Mercedes, precluding a probable cause finding. Def. Mem. at 17; Dkt. No. 94.

First, the CRI's information was not stale as a matter of law. There is "no fixed formula" for determining when information becomes stale. *United States v. Petruk*, 929 F.3d 952, 960 (8th Cir. 2019) (quoting *United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008); *see also United States v. Koeling*, 992 F.2d 817, 822 (8th Cir. 1993) ("There is no bright-line test for determining when information is stale."). Instead, courts assess the property subject to search and the nature of the alleged criminal act. *Id.* Where a crime is "of a continuous nature" the passage of time between obtaining the information and executing the search is "less significant." *Id.* (quoting *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995). In *Maxim*, the Eighth Circuit determined that even three-year-old information about the defendant's possession of a firearm was not stale. *Maxim*, 55 F.3d at 397-398. In narcotics investigations, "weeks or months" between a CRI-reported act and the search does not necessarily make that information stale. *United States v. Davis*, 867 F.3d 1021, 1028 (8th Cir. 2017). In *Davis*, officers had reason to believe the defendant had been selling narcotics for over a year. They had information about numerous suspected drug transactions occurring within five weeks of the search. While there was a ten-day period between the last witnessed suspected drug transaction and execution of a search, that alone did not diminish probable cause because of the ongoing nature of the defendant's drug activity. *Id.*

The same can be said in Robinson's case. The CRI told MPD that Robinson was in possession of a gun, that they had seen the gun, that Robinson kept the gun in his Mercedes, and that they had seen Fentanyl in that same car. Tr. of Mot. Hrg. at 52:8-22;

9

Dkt. No. 87. Only eleven days passed between the CRI's tip to police that Robinson kept a firearm in his Mercedes and the search of the car. Def. Mem. at 16; Dkt. No.94; Tr. of Mot. Hrg. at 86:1-16; Dkt. No. 87; *United States v. Faulkner*, 826 F.3d 1139, 1145 (8th Cir. 2016).[4] Because the information indicated Robinson *continuously* possessed the firearm in his car, eleven-day-old information was not stale. *See Maxim*, 55 F.3d 397-398 (finding three-year-old information valid because "the federal gun control statute punishes [ongoing] *possession* . . . of a firearm"). Furthermore, after the CRI provided information to MPD, officers tailed Robinson and witnessed what they believed were hand-to-hand narcotics transactions, further bolstering the informant's reliability. Tr. of Mot. Hrg. at 48:6-19; Dkt. No 87. Based on the CRI's information and the police's own surveillance, there was ample probable cause to suspect evidence of a crime would be found in Robinson's Mercedes.

Second, Dauble's observations at the scene about suspected drug use were sufficient to find probable cause to search the car. When Robinson was being pulled out of the car, Dabule bent forward to see Robinson's face better and asked him what was under his nose. Gov. Ex. 1 at 11:09:05. He later explained he thought he saw cocaine on Robinson's face. Tr. of Mot. Hrg. at 53:25-54:5; Dkt. No. 87. Dauble also reported smelling marijuana coming from the car. *Id.* It is well-settled that the smell of marijuana is sufficient to establish probable cause to search a car, *United States v. Winters*, 22 F.3d 1039, 1042 (8th Cir. 2000), but Robinson implores the Court to discount Dauble's report, arguing he had already made up his mind to search the Mercedes before he smelled marijuana and

---

[4] Aside from being stale—a challenge to the CRI's reliability, Robinson does not appear to challenge veracity or basis for knowledge of the CRI's information. Def. Mem. at 16; Dkt. No. 94; *see United States v. Petruk*, 929 F.3d 952, 960 (8th Cir. 2019).

10

the report of the odor was a post hoc rationalization for the search. Def. Mem. at 16; Dkt. No.94. Even discounting the odor of marijuana, Dauble's questioning of what was under Robinson's nose and suspicion it was cocaine was enough to constitute probable cause to believe there was contraband or evidence of a crime in the Mercedes.

Because there was probable cause, the automobile exception to the Fourth Amendment's warrant requirement applied here. However, Robinson suggests that the automobile exception did not apply because there was no exigency—both Robinson and the passenger were detained in separate squad cars leaving no chance they could move the Mercedes or destroy evidence inside the car. Def. Mem. at 14; Dkt. No. 94. While an original justification for the automobile exception included exigency, the "pervasive schemes of regulation" on the roadways equally justify the exception today. *California v. Carney*, 471 U.S. 386, 391-392 (1985). That there was no exigency at the time of the search does not moot the automobile exception and its application here. The Court recommends the Motion to Suppress Search and Seizure of the Mercedes [Dkt. No. 31] be denied.

## II.    Questioning on August 11, 2021

After his arrest on August 11, 2021, Robinson ingested an indeterminate number of pills which were believed to be Fentanyl. Gov Ex. 1 at 11:42:44. After receiving Narcan to counteract the opioids, he was transported to the hospital for further treatment. *Id.* at 11:46:19-12:30:00. Later that day, Officer Dauble met with Robinson to discuss Robinson's alleged crimes. Dauble Mirandized Robinson and Robinson indicated he understood his rights and was waiving them. Gov. Ex. 3 at 4:03-4:30. Robinson now argues his waiver was invalid, contending that because he may have still been under the

11

influence of Fentanyl, he was incapable of making a knowing and intelligent waiver of his rights. Def. Mem. at 18; Dkt. No. 94.

Police must notify a defendant of their procedural rights whenever subjecting them to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966). Whether a defendant is in custody depends on the circumstances surrounding the questioning, the critical inquiry being whether "a reasonable person would have felt free to terminate the questioning and leave." *United States v. Simpson*, 44 F.4th 1093, 1096 (8th Cir. 2022) (quoting *United States v. Ferguson*, 970 F.3d 895, 901 (8th Cir. 2020). Interrogation under *Miranda* includes "express questioning" as well as "words or conduct that officers should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Jones*, 842 F.3d 1077, 1082 (8th Cir. 2016) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

Waiver of these rights must be knowing, intelligent, and voluntary. *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). To be voluntary, waiver must not be the product of "intimidation, coercion or deception." *Id.* To be knowing and intelligent, waiver must be made with an understanding of the rights being waived and the consequences of that waiver. *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Courts consider the totality of the circumstances when assessing the validity of waiver. *Id.* A defendant's intoxication is but one circumstance to consider; there is no per se rule about how intoxication affects the validity of *Miranda* waiver. *United States v. Turner*, 157 F.3d 552, 555-556 (8th Cir. 1998).

Here, the totality of the circumstances suggest Robinson was able to make a knowing and intelligent waiver of his rights. While he appeared confused at times during

the ambulance ride to the hospital (Gov. Ex. 1 at 12:07:50; 12:12:25; 12:13:40), he also was interested in the ambulance monitor readings and was tracking them carefully. *Id.* at 12:08:55-12:09:38. He strongly objected to getting an IV (*id.* at 12:08:08), suggesting he was aware of what the paramedics were telling him and actively engaged in his care. While he had trouble answering some basic biographical questions, he also conversed with the paramedics periodically throughout the ambulance ride. *Id.* at 12:00:00-12:30:00. Moreover, because the exact timing of Dauble's questioning is unclear, it is likewise unclear how much weight should be given to Robinson's perceived confusion while in the ambulance. If Dauble spoke with Robinson immediately after the ambulance ride, these observations may be more probative than if Dauble and Robinson spoke later in the afternoon.

Robinson describes as "odd" his response to hearing law enforcement would use his words against him. He claims his response demonstrates confusion, which is particularly surprising given Robinson's past criminal history. Def. Mem. at 18; Dkt. No. 94. The Court finds Robinson's response to be quite apt. Robinson clearly understood the meaning of the warning—exclaiming that he was certain the police would use his statements against him. Gov. Ex. 3 at 4:03-4:30. That alone helps demonstrate his past criminal history, his understanding of what Dauble was saying, and his intelligent waiver thereafter.

Furthermore, listening to the recording of the waiver and subsequent interrogation, Robinson did not appear so intoxicated that he did not understand his rights or waiver of those rights. Even where a defendant tells police he is under the influence, the defendant's behavior may still demonstrate he understands his rights and knowingly

13

waives them. *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) (where defendant had taken PCP prior to interrogation, waiver may be knowing); *see also United States v. Byrne*, 83 F.3d 984, 989 (8th Cir. 1996) (holding the same as to the waiver's voluntariness requirement). Compared to his demeanor during the ambulance ride, when Robinson was in obvious physical distress, Robinson appeared significantly calmer during Dauble's interrogation. Robinson's answers were responsive to the questions being asked and he appeared to understand what was going on. During the whole of their conversation, Robinson seemed lucid. Gov. Ex. 4. The totality of the circumstances confirm that waiver of his rights under *Miranda* was voluntary, knowing, and intelligent and the Court recommends his Motion to Suppress Statements, Admissions, and Answers [Dkt. No. 30] be denied.

### III.   CSLI Warrant

Robinson's motion asserts generally that the CSLI warrant was not supported by probable cause, but he does not identify any facts or allege any particular deficiencies in the warrant. Dkt. No. 67. His post-hearing briefing on this motion merely states the challenge "rests on the four-corners of the warrant." Def. Mem. at 20; Dkt. No. 94. The Government argues the warrant was supported by probable cause and clearly delineated the bounds of the warrant. Gov. Mem. at 18-19; Dkt. No. 98.

The Court declines to undertake a fulsome review of the warrant under these circumstances, where the Defendant has not identified any particular deficiency or defect with the warrant and its underlying support. Because the court affords "great deference" to the issuing judge's probable cause determination, the Court will not disturb that

determination absent a specific, articulated challenge. *See*, *United States v. Butler*, 594 F.3d 955, 962 (8th Cir. 2010). The Court recommends this motion [Dkt. No. 67] be denied.

## IV. Questioning on April 11, 2022

Robinson challenges numerous un-Mirandized statements he made to Dauble while at HCMC on April 11, 2022. He claims that the conversation amounted to interrogation because Dauble should have known his questions and comments would elicit a response. Def. Mem. at 21; Dkt. No. 94. The Government has agreed not to use any of the statements Robinson challenges in its case in chief. Def. Mem. at 27-28; Dkt. No. 99; Government's Supplemental Response to Defendant's Pretrial Motions to Suppress Evidence at 2; Dkt. No. 99. The Court thus recommends the motion [Dkt. No. 80] be denied as moot.

## V. The Seizure and Search of the Toyota

Robinson argues the seizure of the rented Toyota at HCMC was unlawful because the police had no warrant or probable cause to seize the car. Def. Mem. at 24; Dkt. No. 94. He further argues that because the seizure was unlawful, the later search of the Toyota was unlawful for being the fruit of the poisonous tree. *Id.* at 24-26. The Government argues that Robinson has no standing to challenge the Toyota seizure or search, because he did not enjoy a legitimate expectation of privacy in the rental car. Gov. Mem. at 21-23; Dkt. No. 98.

Because Fourth Amendment rights are personal rights that may not be asserted vicariously, a person challenging a search must demonstrate a privacy interest in the thing or place searched. *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015). When analyzing standing, this Court considers:

15

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.* (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)). The defendant bears the burden of proving his legitimate expectation of privacy. *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995). The authorized renter of a rental car has standing to challenge a search of that car, *Byrd v. United States*, 138 S.Ct. 1518 (2018), as does an unauthorized driver who can establish they had "consent or permission" from the owner or renter. *United States v. Muhammad*, 58 F.3d at 355. The Eighth Circuit has also explained that to have a property interest in a car, a defendant must have the keys and be in control of the car. *United States v. Macklin*, 902 F.2d 1320, 1330 (8th Cir. 1990); *United States v. Rose*, 731 F.3d 1337, 1343 (8th Cir. 1984) (defendant had standing where he was a passenger but had control over the keys and had given another person permission to drive). "Mere passengers" do not automatically enjoy the requisite privacy interest in a car to challenge its search or seizure. *United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004). This comports with broader Fourth Amendment law that "presence on the premises" of a place to be searched is not "controlling" on the question of legitimate expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 148 (1978).

### A.     Robinson lacks standing to challenge Toyota seizure and search

Robinson has not met his burden to prove he had a legitimate expectation of privacy in the Toyota and he thus lacks standing to challenge its seizure and search. At bottom, Robinson has not demonstrated he had permission to drive the car. While Robinson claims he had permission to sit in the car and smoke cigarettes, the cases he

16

cites in support of standing all involved defendants who had apparent permission to *drive* the cars. *See United States v. Russell*, 847 F.3d 616, 619 (8th Cir. 2017) (defendant had no standing where he had not provided evidence he was "permitted [] to drive"); *Muhammad*, 58 F.3d at 354-355 (defendant was stopped while driving a car leased in someone else's name); *United States v. Bettis*, No. 17-cr-48 2017 WL 9249436 at *6 (D. Minn. June 19, 2017) (defendant had permission to drive car rented in another's name conferring defendant standing), *aff'd* 946 F.3d 1024 (8th Cir. 2020). Robinson does not allege he was allowed to drive the car. Nor did he present any evidence that he was otherwise in control of the vehicle. *See Macklin*, 902 F.2d at 1330; *Rose*, 731 F.3d at 1343. In fact, Robinson told officers on April 11, 2022, that he had never driven the car. Gov. Ex. 6 at 14:46:41. At least twice he told MPD that the car did not belong to him. Gov. Ex. 5 at 12:55:30; Gov. Ex. 6 at 14:44:20. These statements suggest Robinson was disclaiming control of the vehicle, which belies his argument for standing.

Instead of relying on control of the car, Robinson suggests that permission to *use* the car was enough to confer standing. But just as having permission to ride in a car does not automatically afford a legitimate expectation of privacy in that car, neither does having permission to merely smoke in the car. *Cf. United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004). Furthermore, neither Robinson nor Tony, the authorized renter of the car, testified to this alleged permission. Robinson's having ridden in the Toyota on the way to the hospital (Gov. Ex. 5 at 12:57:50) does not give him standing to challenge the seizure for this same reason. Without more evidence, Robinson has not met is burden of proof as to his expectation of privacy in the Toyota and he lacks standing to challenge its seizure and search.

### B. Police had probable cause to seize the vehicle

Even if the District Court finds that Robinson did have standing to challenge the seizure of the Toyota, Robinson's challenge fails. As with the Mercedes, the automobile exception to the Fourth Amendment's seizure requirement would apply here. Where there is a fair probability under the totality of the circumstances that contraband or evidence of a crime will be found in a particular place, there is probable cause to search. *Kennedy*, 427 F.3d at 1140.

*United States v. Hill*, 386 F.3d 855 (8th Cir. 2004), is instructive here. In *Hill*, the Eighth Circuit held that a defendant's nervous behavior, including disclaiming ownership of the subject car and insisting someone else drive it away, his reputation for drug dealing, a warrant for a controlled substance crime, and alert from a narcotics-trained canine, all supported a probable cause finding to search his car. *Id.* at 858. While the dog-sniff in Robinson's case happened after the Toyota was seized, the other indicia of probable cause found in *Hill* are found here.

Robinson seemed nervous about his possession of the Toyota keys, telling officers multiple times that the car was not his, that he had not driven it, and that it belonged to Tony. He implored them repeatedly to call Tony. Gov. Ex. 5 at 12:55:30, 12:57:13, 12:57:45; Gov. Ex. 6 at 14:44:20, 14:46:41. This nervous behavior is suspicious. *See Hill*, 386 F.3d at 857. Furthermore, the police knew Robinson had warrants out for his arrest. Tr. of Mot. Hrg. at 22:10-25. As with Hill's reputation as a drug dealer, police suspected Robinson of dealing for many months—at least since the previous summer when the events involving the Mercedes occurred. And while there was no dog-sniff here, which the Eighth Circuit had given most weight in *Hill*, the police had been surveilling Robinson

in the weeks leading up to his April 11, 2022 arrest. They had witnessed him both riding in and driving multiple different vehicles and conducting suspected narcotics transactions from those cars. Tr. of Mot. Hrg. at 24:6-25:13. This coupled with their earlier surveillance of Robinson's activity in his Mercedes suggests ongoing drug dealing and helps establish probable cause to seize the Toyota. *See United States v. Davis*, 867 F.3d 1021, 1028 (8th Cir. 2017). Moreover, Robinson had already been arrested for narcotics distribution once before the previous August. *See supra*. In all, these circumstances suggest a fair probability that contraband or evidence of a crime would be found in the Toyota, providing law enforcement probable cause to seize the car without a warrant pursuant to the automobile exception. Because this initial seizure of the Toyota was not unlawful, the resulting search was not fruit of the poisonous tree, at Robinson argues. The Court recommends his motions to suppress the seizure and search of the Toyota [Dkt. Nos. 66, 68] be denied.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT:

1.  Robinson's Motion to Suppress Statements, Admissions, and Answers [Dkt. No. 30] be **DENIED**

2.  Robinson's Motion to Suppress Search and Seizure [Dkt. No. 31] be **DENIED.**

3.  Robinson's Motion to Suppress Search and Seizure – Toyota Camry [Dkt. No. 66] be **DENIED.**

4.  Robinson's Motion to Suppress Search and Seizure – SW for live cell site pings [Dkt. No. 67] be **DENIED.**

5.      Robinson's Motion to Suppress Seach and Seizure SW for Toyota Camry [Dkt. No. 68] be **DENIED.**

6.      Robinson's Second Motion to Suppress Statements [Dkt. No. 80] be **DENIED.**

Dated: February 3, 2023                                    s/David T. Schultz  
                                                                       DAVID T. SCHULTZ  
                                                                       U.S. Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).